**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **David E.,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 18 C 727** |
| **v.** | ) | |
| | ) | **Magistrate Judge Finnegan** |
| **ANDREW M. SAUL, Commissioner of Social Security,**[1] | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>**ORDER**</u>

Plaintiff David E. filed this action seeking review of the final decision of the Defendant Commissioner of Social Security (the "Commissioner") denying his claim for Disability Insurance Benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. (Doc. 1). The parties consented to the jurisdiction of a United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and the case was reassigned to this Court. (Docs. 5, 8). Plaintiff has now filed a brief requesting that the Commissioner's decision be reversed and the case be remanded for further proceedings (Doc. 15), and the Commissioner has responded with a Motion for Summary judgment requesting that the decision be affirmed. (Doc. 24). After reviewing the record and the parties' respective arguments, the Court concludes that the case must be remanded for further proceedings as outlined below. The Court therefore denies the Commissioner's motion for summary judgment and grants Plaintiff's request for remand.

---

[1]  Commissioner Saul is substituted for his predecessor, Nancy A. Berryhill, pursuant to Fed. R. Civ. P. 25(d).

## BACKGROUND

**I.    Procedural History**

Plaintiff filed his DIB and SSI applications on April 30, 2015, alleging disability beginning on October 28, 2012 (following a car accident that day) due to severe arthritis and pain in both hips, avascular necrosis or "AVN" (death of bone tissue caused by a lack of blood supply) in the right hip, no blood circulating in the right hip, pain in both legs, inability to bend over and stand up straight without help, lower back pain, headaches, memory loss, and depression.  (R. 95-96, 106-07, 117-18).[2]  Plaintiff was 36 years old on his alleged onset date (R. 54, 95, 106), which is defined as a younger individual age 18-44.  20 C.F.R. § 404.1563.[3]  His date last insured is March 31, 2016.  (R. 242).

The DIB and SSI applications were denied initially on October 19, 2015 (R. 117-18), and on reconsideration on February 9, 2016 (R. 153-54).  Plaintiff then requested a hearing (R. 171-72), which was later held before Administrative Law Judge ("ALJ") Bill Laskaris on December 14, 2016, where Plaintiff was represented by counsel.  (R. 62).  Both Plaintiff and Vocational Expert ("VE") Kathleen Dayla testified at the hearing.  (R. 63).  The ALJ denied Plaintiff's claims in a decision dated March 6, 2017 (R. 42-56), finding Plaintiff has an RFC to perform sedentary work as described to the VE with certain restrictions (R. 48-49) and could perform various jobs that existed in significant numbers in the national economy.  (R. 55).

---

[2]     Citations to the Certified Copy of the Administrative Record filed by the Commissioner (Doc. 9) are indicated herein as "R."

[3]     Because the regulations governing DIB and SSI are substantially identical, for convenience, only the DIB regulations are cited herein.

Plaintiff sought review with the Appeals Council, but that request was denied on December 6, 2017 (R. 1-7), rendering the ALJ's March 2017 decision the final decision of the Commissioner reviewable by this Court. *Shauger v. Astrue*, 675 F.3d 690, 695 (7th Cir. 2012). Plaintiff now makes the following arguments for reversal: (1) the ALJ's RFC determination is not supported by substantial evidence, (2) his subjective symptom analysis was erroneous, and (3) his conclusion regarding jobs in the national economy that Plaintiff was able to perform was also unsupported. As explained below, the Court partially agrees with the first two arguments and rejects the third.

## II.  Work  History and October 28, 2012 Accident

Plaintiff completed two years of college (R. 247), and worked in various positions in the years before the October 28, 2012 car accident and alleged onset of his disability: janitorial custodian (February to December 2007); technician for phone company (February to August 2008); field technician for cable company (September 2008 to April 2010); and temporary maintenance employee (September to December 2010). (R. 248, 254). The record indicates no work in 2011 or in the 10 months of 2012 preceding the accident. (*Id.*).

Plaintiff claimed and testified in the proceedings below that his impairments and related pain have persisted since he sustained a brain hemorrhage and cervical spine fracture in the automobile accident on October 28, 2012, after which he was hospitalized in an induced coma for about a week and hospitalized for about six weeks. (R. 71, 335, 414, 417). Plaintiff did not work again until March 2014 when he held a position at Home Depot where he worked nights cleaning, stocking, and reorganizing a  garden center. (R. 70, 248, 254). Plaintiff also claimed and testified in the proceedings below that he attempted to maintain gainful employment after the accident in order to meet his financial

needs, but it was difficult for him to perform required tasks due to painful movement, and he ultimately quit his Home Depot job in July 2014 because he was in too much pain to continue.  (R. 71-73, 253-54).  Plaintiff also stated that he attempted to find other work afterward and interviewed for two customer service jobs, but he was unable to qualify for their physical requirements and was not hired.  (*Id.*).  None of his work after the alleged onset date of October 28, 2012 amounted to substantial gainful activity.  (R. 44).

### III.    Medical History

#### A.    AVN Diagnosis and Initial Treatment

Although Plaintiff traces his hip pain back to his October 2012 car accident, his earliest treatment notes are from a Cook County Hospital Emergency Department  ("ED") visit on November 7, 2013, when Plaintiff complained of right hip pain of 5 on a scale of 1 to 10 for the previous two weeks, worse with walking and relieved by rest.  (R. 343).  He was diagnosed with a hip sprain and directed to take ibuprofen as needed and return to the ED if the pain worsened.  (R. 345-46).  Plaintiff twice followed up with Dr. Earl Fredrick of the Christian Community Health Center ("CCHC") in March 2014, complaining of daily right hip pain for the previous year and was directed to take ibuprofen three times daily. (R. 366, 369).   Plaintiff then returned to the Cook County ED on May 12, 2014, complaining of pain in his back and right hip, and an AP x-ray revealed moderate narrowing of both hip joints and sclerosis (stiffening) of both acetabulum (hipbone sockets).  (R. 347, 350).

Plaintiff continued treatment with Dr. Fredrick and Dr. Carl Vancol (also of CCHC) from August to October 2014, during which he complained of persistent bilateral hip and lower back pain, up to 7 on a scale of 1 to 10, sometimes severe enough to wake him up at night.  (R. 354-65).  Dr. Vancol prescribed Tramadol and Flexeril and ordered MRIs of

4

Plaintiff's hips and lumbar spine (*id.*), which were done on September 29, 2014. (R. 372-75). The MRI of Plaintiff's lumbar spine revealed only mild degenerative changes (R. 373), but the MRI of Plaintiff's hips indicated that they were "relatively symmetrically abnormal" and "most suggestive of avascular necrosis." (R. 374). That diagnosis was later confirmed on March 19, 2015, following another MRI the same day that also revealed bilateral hip AVN slightly more pronounced on the right. (R. 402-03). At the time of this diagnosis, Plaintiff was reporting greater pain with activities and standing and sitting for long periods of time. (*Id.*). He was advised this condition would "most likely worsen," and referred for bilateral hip injections. (*Id.*).

### B. Referrals for Surgery

Plaintiff received injections in both hips on March 24, 2015, and was advised that additional injections could be attempted in six weeks if he experienced moderate symptomatic relief. (R. 395-400). But during his follow-up visit on June 22, 2015, Plaintiff reported that the injections had provided only short-term relief and anti-inflammatories provided no relief at all, and he was observed to have "obvious bilateral limps, slightly more pronounced on the right." (R. 392). Given these results, Plaintiff decided to proceed with a total hip arthroplasty (bilateral hip replacement) at Cook County Stroger Hospital and was meanwhile administered another set of hip injections to address his "severe bilateral hip pain secondary to AVN" while he awaited surgery. (R. 388, 392). But on August 7, 2015, shortly before the surgery was to take place, Plaintiff's doctor cancelled the procedure after consulting with the anesthesiologist because Plaintiff had an upper respiratory infection and his urine had tested positive for cocaine. (R. 409, 438).

Plaintiff was again cleared for surgery on August 26, 2015, but given no definite date for it. (R. 426-28, 438). He then visited Cook County's ED on September 11, 2015,

complaining of constant, severe pain in both hips, for which he was prescribed a short course of Norco and directed to follow up with the Orthopedic and Primary Care Clinics. (R. 436-40). During a follow-up appointment in the Ortho Clinic three days later, Plaintiff requested additional pain medications and a new surgery date, after reporting worsening pain in both hips, difficulty walking and sitting for extended periods, climbing stairs, and bending to put on socks or tie shoes. (R. 448-49). But Plaintiff was advised that no more Norco could be prescribed, no surgery dates were available, and he should return in six weeks to inquire about a possible new surgery date or request his records to take to another hospital if he wanted to have the surgery elsewhere. (*Id.*). Plaintiff did return six weeks later (on October 26, 2015), and was again observed limping and now walking with a cane. (R. 451-52). But Plaintiff was then told that he had been placed at the bottom of a waiting list for a new surgery date due to the previous cancellation and no new surgery date would be available before March 2016. (R. 451). He was also referred for physical therapy and to a pain clinic, because ibuprofen was not controlling his pain. (*Id.*).

Also during this time (and following applications for DIB and SSI on April 30, 2015), Plaintiff underwent a psychological consultative examination with Dr. Jeffrey Karr on September 17, 2015, and a medical consultative examination with Dr. Dante Pimentel on October 9, 2015. (R. 414-23). During the medical exam, Plaintiff reported daily bilateral hip pain of 8 on a scale of 1 to 10, that he could stand for only 20 minutes due to pain, and difficulty navigating up and down stairs. (R. 417). Plaintiff also reported difficulty walking distances (*id.*), and Dr. Pimentel observed that he walked with a slight right-sided limp. (R. 419). Dr. Pimentel also noted that Plaintiff walked with the aid of a cane (R. 422), though he could walk greater than fifty feet unassisted, albeit with a slightly

abnormal gait.  (R. 419).  During the psychological examination, Dr. Karr similarly noted that Plaintiff carried a cane but could walk briefly without it.  (R. 415).

As directed, Plaintiff again sought a new surgery date at Stroger Hospital on March 7, 2016.  (R. 493).  He was again walking with a cane and now had reduced hip rotation bilaterally due to pain (25 degrees external rotation and 0 degrees internal rotation).  (R. 491-93).  Pelvis x-rays obtained that day showed joint space narrowing and changes consistent with progressive bilateral AVN now more severe on the left side, along with possible bony cyst formulation.  (*Id.*).  Plaintiff reported that he had been following up with the pain clinic, and that his pain was fairly well managed with medications, but he still wanted hip replacement surgery.  (*Id.*).  Once again, however, no surgery date was provided, and Plaintiff was told that no date would be provided until the hospital was able to put him back on its surgery schedule.  (R. 493).  The same transpired again six months later in September 2016:  x-rays again showed bilateral AVN and joint space narrowing more pronounced on the left side, but no surgery date was provided, and it was now explained that elected surgeries were largely backlogged due to the high volume of trauma surgeries, and that Plaintiff should follow up in another six months about a possible surgery date.  (R. 472-74).  Three months later on December 1, 2016, Plaintiff reported his pain was severe and constant (R. 454), and he was again referred to physical therapy and Orthopedic Surgery.  (R. 456, 462).

## IV.  Hearing Before the ALJ

On December 14, 2016, Plaintiff appeared with counsel at a hearing before ALJ Laskaris  (R. 62).  Plaintiff testified that all of his hip pain started after his 2012 car accident (R. 71), and as of the hearing, he had pain of 8 ½ on a scale of 1 to 10 in both hips, his lower back, thighs, and knees, which ibuprofen did not help at all, and which kept

7

him up at night.  (R. 74-79).  He said he had problems standing too long, sitting longer than 15-20 minutes, and getting in and out of a car, and that he alternated sitting and standing to alleviate pain.  (R. 78, 83-84).  Plaintiff also stated that he could walk only about half a block and needed his cane to stand up, to walk, and for balance, and that he was afraid of failing without it.  (R. 74, 79, 83).  Regarding his surgery, Plaintiff explained that he had tried repeatedly to reschedule it after the first cancellation at Stroger Hospital, but he was unable to obtain another surgery date, so he had recently switched his County Care Medicaid HMO over to the University of Chicago Hospital and was hoping to have the surgery done there.  (R. 74-77; *see also* R. 27).[4]

In response to questions from the ALJ, the VE testified about the ability of a person of Plaintiff's age, education, work experience, and skill set, who could perform sedentary work (lift up to 10 pounds), stand or walk for approximately 2 hours per 8-hour day, and sit for approximately 6 hours per 8-hour day.  (R. 87).  According to the VE, such a person could not perform Plaintiff's past work (File Clerk, Industrial Cleaner, and Cable Installer), but could perform the jobs of Circuit Board Assembler, Information Clerk, and Address Clerk.  (R. 86-88).  In response to additional hypotheticals, the VE also testified that such a person would remain capable of performing these jobs with the added limitations of "using a handheld assistive device, required only for uneven terrain or prolonged ambulation" of greater than 50 feet, and a "sit/stand option," which would "allow this person to stand for 20 minutes after sitting for 45 minutes, provided this person is not off-task more than 10% of the work period."  (R. 88-89).

---

[4]     According to Plaintiff's brief, the surgery was later scheduled at the University of Chicago on August 3, 2017, and was completed after the ALJ's decision in this case.  (Doc. 15, at 5, citing R. 9-32).

The ALJ denied Plaintiff's claims in his March 6, 2017 decision. (R. 42-56). Although he found Plaintiff suffers from several severe impairments (degenerative joint disease of the hips, asthma, and obesity), the ALJ also found that Plaintiff has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment. (R. 44-47). He also found that Plaintiff has an RFC to perform sedentary work as described to the VE (lifting no more than 10 pounds, using a hand-held assistive device only for uneven terrain and ambulation greater than 50 feet, and with a sit/stand option of standing for twenty minutes after sitting for forty-five, provided he is not off-task more than 10%), along with certain postural and environmental limitations not at issue here. (R. 48-49). Based on this RFC and the VE's testimony that such a person could perform the jobs of Circuit Board Assembler, Information Clerk, and Address Clerk, the ALJ found that Plaintiff, though unable to perform his past work, could nevertheless make a successful adjustment to other work that exists in significant numbers in the national economy, and therefore is not disabled. (R. 55).

## DISCUSSION

### I. Governing Standards

#### A. Five-Step Inquiry

To recover DIB or SSI benefits, a claimant must establish that he is disabled within the meaning of the Social Security Act. *Karafesieva v. Colvin*, No. 15 C 1186, 2016 WL 4137203, at *6 (N.D. Ill. Aug. 4, 2016). A person is disabled if he is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The following five-step inquiry is required to determine whether a claimant

is disabled: (1) Is the claimant presently unemployed? (2) Is the claimant's impairment severe? (3) Does the impairment meet or equal one of the impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work?  20 C.F.R. § 416.920.

## B.    Standard of Review

Judicial review of the Commissioner's final decision is authorized by 42 U.S.C. § 405(g).  But in so doing, the Court may not engage in its own analysis of whether the claimant is severely impaired.  *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may the Court "displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations."  *Castile v. Astrue*, 617 F.3d 923, 926 (7th Cir. 2010) (quoting *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007)).  A court "will reverse an ALJ's determination only when it is not supported by substantial evidence, meaning 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011)).

In making this determination, the Court must "look to whether the ALJ built an 'accurate and logical bridge' from the evidence to [his] conclusion that the claimant is not disabled."  *Simila v. Astrue*, 573 F.3d 503, 513 (7th Cir. 2009) (quoting *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008)).  The ALJ need not, however, "provide a complete written evaluation of every piece of testimony and evidence."  *Pepper*, 712 F.3d at 362 (quoting *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005)).  Still, where the Commissioner's decision "'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required."  *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 698 (7th Cir. 2009) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)).

## II.     Analysis

### A.     The ALJ's RFC Determination

Plaintiff challenges the ALJ's RFC determination in three respects.  The first two arguments attack the RFC limitation allowing him a sit/stand option of standing twenty minutes after sitting 45 minutes so long as he is not off-task more than 10% of the day, whereas Plaintiff's third argument challenges the limitation allowing him use of a cane "only for uneven terrain and prolonged ambulation greater than 50 feet."  (Doc. 15, at 9-11).  The Court rejects Plaintiff's arguments regarding the sit/stand option, but agrees that the RFC limitation regarding his use of a cane requires remand.

### 1.     The Sit/Stand Option

Regarding the sit/stand option, Plaintiff first complains that the ALJ's implicit finding in this limitation that he would not be off-task more than 10% came "without any explanation."   (Doc. 15, at 10).   The Commissioner responds that Plaintiff "is impermissibly shifting the burden," since it is instead Plaintiff's burden "to prove the extent of his disability."  (Doc. 25, at 7).  The Court agrees.  While an ALJ may be obliged to explain why he rejected evidence that a claimant would be off-task a greater percentage of time than the ALJ found (*e.g.*, *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017)), Plaintiff here neither cites such evidence nor even argues that he would be off-task to a greater degree.  And in fact, Dr. Pimentel's consultative Mental Status Examination and the state agency reviewer on reconsideration (all expressly relied upon by the ALJ) each confirmed Plaintiff's ability to stay on task.  (R. 46-47, 50-53, 122, 126, 128, 132, 139, 143, 145, 149, 415, 419).   Thus, Plaintiff has failed to demonstrate that the on-task requirement of his sit/stand option was unsupported.  *See Ball v. Saul*, No. 18-cv-888, 2019 WL 3334658, at *3 (W.D. Wis. July 25, 2019) (upholding sit/stand option requiring

that claimant "is not off-task more than 10% each work day": "*Lanigan* is distinguishable because the plaintiff in that case pointed to evidence that he would be off-task more often than the amount found by the ALJ," whereas "Ball cites no evidence or even identifies a reason why she would be off-task more than 10 percent of the work day").

Plaintiff's second criticism of this limitation fares no better. He argues that the ALJ failed to substantiate the requirement that Plaintiff sit for forty-five minutes at a time, citing his hearing testimony claiming that he could sit for only twenty minutes before needing to alternate to a standing position. (Doc. 15, at 10, citing R. 83). But even Plaintiff concedes that he completed a Pain Report for his applications on November 30, 2015, which admitted his ability to sit for 30 to 45 minutes "at a time." (*Id.*; R. 294). Once again, the state agency reviewer on reconsideration noted this admission. (R. 127, 132, 144, 149). The state agency reviewer at the initial level also fully credited Plaintiff's claim of difficulty sitting for "long periods of time" as consistent with Plaintiff's AVN diagnosis and objective findings, even though they did not yet have access to Plaintiff's November 2015 Pain Report. (R. 101, 112). As the ALJ acknowledged, however, each of the state agency reviewers at the initial and reconsideration levels omitted any RFC limitation regarding Plaintiff's ability to sit for extended periods despite this evidence, thus "underestimating" Plaintiff's "need for a sit-stand option." (R. 52). The ALJ therefore properly included such an option in Plaintiff's RFC. But while the ALJ acknowledged Plaintiff's testimony claiming an ability to sit for only 20 minutes at a time, he reasonably rejected that claim as inconsistent with the medical evidence and other evidence in the record and instead adopted Plaintiff's own admitted ability to sit for up to 45 minutes. (R. 49). Contrary to Plaintiff's suggestion, the ALJ committed no error in making that assessment, since "an ALJ is 'free to discount the applicant's testimony on the basis of the other evidence in the

case' as 'applicants for disability benefits have an incentive to exaggerate their symptoms.'" *Stepp v. Colvin*, 795 F.3d 711, 720 (7th Cir. 2015) (quoting *Johnson v. Barnhart*, 449 F.3d 804, 805 (7th Cir. 2006) (brackets omitted)).

### 2.    The Assistive Device Limitation

Plaintiff's final challenge to the RFC determination – regarding the limitation that he use a cane "only for uneven terrain and prolonged ambulation greater than 50 feet" – is more persuasive.  As Plaintiff argues, contrary to the ALJ's apparent assumption that Plaintiff required a cane in only these two settings, the record contained ample evidence that he used his cane at all times standing and walking.  (Doc. 15, at 10, citing R. 83, 268, 277, 294, 301, 419, 452, 493).  Plaintiff testified that he used the cane everyday to stand up, walk, and balance, and that he could not move or get around, and was afraid to fall, without it.  (R. 79, 83).  His treating physicians also noted his use of a cane (R. 452, 493) and his "obvious bilateral limps."  (R. 392, 451).  Dr. Pimentel's consultative examination report similarly stated that Plaintiff "walks with the aid of a cane for ambulation" and "with a slight right-sided limp."  (R. 419, 422).  And while Dr. Pimentel also noted that Plaintiff could "walk greater than 50 feet unassisted," he added that Plaintiff did so "with a slightly abnormal gait."  (R. 419).  As importantly, even after considering Dr. Pimentel's notation that Plaintiff could walk greater than 50 feet unassisted, the state agency reviewers at the initial and reexamination levels (on whom the ALJ expressly relied) each concluded that Plaintiff's RFC should be limited as follows:  "A medically required hand-held assistive device is necessary for ambulation."  (R. 52, 99, 102, 110, 112-13, 126, 128-30, 132, 139, 143, 145-47).

The ALJ's decision failed to address this evidence or explain why it was rejected.  Nor did the ALJ explain the basis for his contrary conclusion that Plaintiff required a cane

only for uneven terrain and ambulation greater than 50 feet.  (R. 52).  Instead, the decision merely noted Dr. Pimentel's statement that Plaintiff could "walk greater than 50 feet unassisted with a slightly abnormal gait" (R. 50-51, citing R. 419), while overlooking Dr. Pimentel's further observations that Plaintiff walked with a "slight right-sided limp" and "with the aid of a cane for ambulation."  (R. 419, 422).  According to the Commissioner, this "adequately supports the residual functional capacity finding that plaintiff can walk up to 50 feet without use of a cane," even though the decision "was not explicit in finding this restriction." (Doc. 25, at 6).  For support, the Commissioner points to Dr. Pimentel's report and other records cited by the ALJ that purportedly show that Plaintiff "had normal or only slightly diminished gait as well as range of motion, strength, and coordination in extremities."  (*Id.*, quoting R. 50, citing R. 345, 349, 371, 420-22, 439, 487).

But there are several problems with this argument.  First, the records relied upon by the ALJ and the Commissioner to show that Plaintiff's lower extremities were only "slightly diminished" predate his use of a cane (R. 345, 349, 371), confirm his hip pain (R. 439), or address an asthma complaint (R. 485-87), and conspicuously omit more current records documenting his bilateral limps and significantly diminished range of motion.  (R. 451-52, 491-93).  Second, the Commissioner's suggestion that Dr. Pimentel's report supported the ALJ's RFC limitation regarding Plaintiff's use of a cane in only limited circumstances is belied by his decision, which found Dr. Pimentel's opinions were "far too conclusory" to support an RFC determination.  (R. 53:  "Although Dr. Pimentel conducted a thorough physical evaluation of the claimant, his conclusions are far too conclusory and lack the specificity required to complete a function-by-function determination of the claimant's residual functional capacity.").  Third, any such reliance solely upon Dr. Pimentel's observation that Plaintiff walked "greater than 50 feet unassisted" would

conflict with Seventh Circuit authority admonishing that such a demonstration does not alone neatly translate into an ability to walk or stand in a work setting.[5]  Those warnings apply with particular force here, given the conclusions of both state agency reviewers that Plaintiff "required" a hand-held assistive device for ambulation, even after considering Dr. Pimentel's notation that he could walk 50 feet without one.  (R. 99, 102, 110, 112-13, 126, 128-30, 132, 139, 143, 145-47).

This is not to say that the RFC limitation requiring a hand-held assistive device recommended by the state agency reviewers should have been adopted, only that the ALJ was required to address that issue directly and explain what evidence supported or negated Plaintiff's need for an assistive device and why.  *See Thomas*, 534 Fed App'x at 550 (7th Cir. 2013) ("The error in this case . . . is not that the evidence *required* the ALJ to find that Thomas needed a cane to stand and walk, but that the ALJ failed to consider the issue at all, leaving us without a finding to review.  We cannot uphold the ALJ's decision based on a reason that the ALJ did not articulate.").  Accordingly, the case is remanded for further consideration of Plaintiff's need for a cane and the impact of any such need upon his RFC.  In so doing, the ALJ is also directed to apprise any vocational expert relied upon of any additional RFC limitations adopted by the ALJ, and seek any expert testimony necessary to determine the availability of jobs that Plaintiff could perform in the national economy after considering that additional restriction.[6]

---

[5]    *See Thomas v. Colvin*, 534 Fed App'x 546, 551 (7th Cir. 2013) ("We have previously concluded, under nearly identical facts, that walking for 50 feet without a cane—a 'brief excursion'—does not demonstrate an ability to stand for 6 hours." (citing *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("Dr. Villanueva noted that Scott successfully walked 50 feet without a can within the confines of her office, but that brief excursion hardly demonstrates an ability to stand for 6 hours (and neither does Scott's testimony that she could walk 2 blocks).")).

[6]    *See Gass v. Berryhill*, No. 16-cv-292, 2017 WL 3705060, at *5 (N.D. Ind. August 28, 2017) (where evidence indicated claimant required cane "even for occasional standing or walking" and

## B. The ALJ's Subjective Symptom Assessment

Plaintiff's attack on the ALJ's subjective symptom evaluation challenges four of the ALJ's reasons for concluding that "the intensity, persistence and limiting effects" of Plaintiff's claimed symptoms were "not entirely consistent with the medical evidence and other evidence in the record" (R. 49): (1) that Plaintiff's daily activities "fail to support debilitating symptoms"; (2) that the Function Report submitted by Plaintiff's mother was entitled to "little weight as it is a lay opinion"; (3) that Plaintiff's "examinations were relatively benign and inconsistent with Plaintiff's disabling symptoms"; and (4) that "his treatment was limited to conservative measures without any recommendation for more aggressive treatment modalities." (Doc. 15, at 6-9). Although the Court finds no error in the ALJ's reliance on the first factor, the latter three require revisiting on remand.

Regarding his daily activities, Plaintiff incorrectly complains that the ALJ "committed a common legal error by failing to recognize that 'the critical differences between activities of daily living and activities in a full-time job are that a person has more flexibility in scheduling the former than the latter.'" (Doc. 15, at 8). But as the Commissioner argues, the ALJ did not improperly "equate" Plaintiff's activities with full-time work. (Doc. 25, at 4). "Rather, the ALJ relied on the activities of daily living to show that plaintiff could, at a minimum, do more than he claimed he could do." (*Id.*). Thus, the ALJ considered Plaintiff's reported ability to attend to his personal care needs, prepare

---

"balance," and not merely "prolonged ambulation, walking on uneven terrain, or ascending or descending slopes," SSR 96-9P suggested that his "ability to perform even sedentary occupations may be significantly eroded" (citing and quoting SSR 96-9P, 1996 WL 374185 (July 2, 1996): "if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded. . . . On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded")).

simple meals, complete household chores, and interact with his girlfriend and family members, and reasonably concluded that these activities alone failed to show debilitating symptoms, not that they demonstrated an ability to work full-time. (R. 53). That reasoning, standing alone, was not improper. *See Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019) ("The ALJ did not equate Burmester's ability to perform certain activities of daily living with an ability to work full time. Instead, he used her reported activities to assess the credibility of her statements concerning the intensity, persistence, or limiting effects of her symptoms consistent with the applicable rules").

That said, the ALJ's remaining reasons for rejecting Plaintiff's claimed symptoms are problematic. For instance, the ALJ accorded little weight to a Function Report submitted by Plaintiff's mother "as it is a lay opinion based upon casual observation, rather than objective medical examination and testing" and "potentially influenced by loyalties of family." (R. 53). Among other things, this statement relayed that Plaintiff lived with his mother, was in pain "all the time," woke up at night in pain, used a cane, and had trouble walking, standing, and climbing stairs. (R. 271-78). As Plaintiff argues, SSR 06-03p expressly provides for the consideration of such lay opinions "on key issues such as impairments severity and functional effects." (Doc. 15, at 9, quoting SSR 06-03p, 2006 WL 2329939, at *3 (Aug. 9, 2006)); *see also Collins v. Berryhill*, No. 17 C 3589, 2018 WL 3361847, at *4 (N.D. Ill. July 10, 2018) (citing SSR 06-03p: "the ALJ improperly gave little weight to the third-party reports because they were 'lay opinions based on casual observation, rather than objective medical examination and testing,'" since "the rules expressly contemplate the inclusion of familial reports as non-medical evidence").[7]

_____

[7] Although the Commissioner correctly notes that SSR 06-03p "has been rescinded" (Doc. 25, at 5), it nevertheless applies to claims such as Plaintiff's that were filed before March 27,

Moreover, the Seventh Circuit "has cautioned against reducing the weight of familial third-party reports merely because the possibility for bias exists." *Id.* ("ALJ failed to properly evaluate Plaintiff's sister's third-party reports," and gave a "flawed" reason for according them "little weight," when stating that they were "potentially influenced by loyalties of family" (citing *Garcia v. Colvin*, 741 F.3d 758, 761 (7th Cir. 2013)). And most critically, while it might be appropriate to accord greater weight to a properly supported medical opinion that was inconsistent with such a familial report (*id*), the ALJ's assessment of the medical evidence that he found inconsistent with the Function Report from Plaintiff's mother was itself at odds with the record.

Specifically, without citation to the record, the ALJ concluded that Plaintiff's alleged symptoms were "not fully consistent with the medical evidence of record" because treating and examining sources "regularly" observed "normal or only slightly diminished" gait, muscle strength, and range of motion in his extremities, and his "treatment history was largely limited to conservative measure, primarily through medication management, with few, if any, recommendations for more aggressive treatment modalities." (R. 53). But these findings overlooked consistent reports of Plaintiff's use of a cane and bilateral limps (R. 392, 451-52, 493), severely reduced range of motion in both hips (R. 491-93), pain uncontrolled by medication (R. 435, 451), and repeated referrals for bilateral hip replacement surgery. (R. 392-93, 426-28, 456). And while Plaintiff encountered numerous obstacles in rescheduling his surgery after it was initially cancelled due to a positive cocaine test and upper respiratory infection, it is equally clear that he repeatedly

---

2017. *Gatner o/b/o M.J. v. Berryhill*, No. 16 C 10531, 2017 WL 6757574, at *6 n.5 (N.D. Ill. Dec. 18, 2017); SSR 96-2p, 2017 WL 3928298 (Mar. 27, 2017) (Rescission of Soc. Sec. Rulings 96-2p, 96-5p, and 06-3p: "This rescission will be effective for claims filed on or after March 27, 2017").

pleaded for the surgery to address his uncontrolled pain (R. 438, 448-49, 451-52, 454-56, 472-74, 491-93), and ultimately switched hospitals to get it. (R. 74-77; *supra* note 4). In concluding that Plaintiff's claimed symptoms were inconsistent with his medical record, the ALJ failed to address these facts, and should do so on remand.

### C. The ALJ's Step Five Determination

Finally, Plaintiff argues that the ALJ's step-5 determination that there were significant jobs in the national economy that Plaintiff could perform (R. 55) was not supported by substantial evidence. (Doc. 15, at 11-13). According to Plaintiff, this conclusion was unfounded because the VE testimony on which it relied (1) cited outdated job descriptions from the Dictionary of Occupational Titles ("DOT") of positions that the VE never personally observed being performed, and (2) relied on job numbers from the database known as SkillTRAN that the VE was unable to explain or replicate. (*Id.*). Neither argument warrants remand.

As the Commissioner correctly asserts, although the Seventh Circuit has repeatedly noted that the DOT is outdated and the Social Security Administration has been working on a more current resource, the court of appeals has found no error in relying on VE testimony that cited job descriptions from the DOT. (Doc. 25, at 10, citing *Chavez v. Berryhill*, 895 F.3d 962, 965 (7th Cir. 2018). To the contrary, the Seventh Circuit and multiple district courts have noted that the Social Security Administration's regulations "authorize the agency to 'take administrative notice of reliable job information' from the DOT, among other publications." *Id.* (citing 20 C.F.R. § 416.966(d)(1)).[8] As a

---

[8] *See also Slone v. Berryhill*, No. 17-cv-00452, 2018 WL 5729591, at *6 (N.D. Ind. Nov. 1, 2018) (same, citing 20 C.F.R. 404.1566); *Horner v. Berryhill*, No. 17 C 4823, 2018 WL 1394038, at *2 n.1 (N.D. Ill. Mar. 20, 2018) (same); *Fitzgerald v. Colvin*, 15-cv-135, 2016 WL 447507, at *11 (W.D. Wis. Feb. 4, 2016) (same, citing 20 C.F.R. §§ 404.1566 and 416.966).

result of these regulations (and as the Seventh Circuit further observed in *Chavez*), "the DOT is a source that VEs regularly canvass to identify job titles suitable for a claimant," yet no Seventh Circuit decision has held that it is error to rely upon that publication's job numbers or the testimony of a VE who does so. *Chavez*, 895 F.3d at 965-67 ("we have not prohibited its use or deemed its application reversible error").

Plaintiff's criticism that the VE did not personally observe performance of all the jobs she discussed does not alter this conclusion. Although such personal observation can strengthen the testimony of a vocational expert (*e.g.*, *Ragland v. Berryhill*, No. 17-c-0730, 2018 WL 1757656, at *12 (E.D. Wis. Apr. 12, 2018)), Plaintiff cites no requirement to provide such corroboration. Nor was there any requirement that the VE explain the methodology used by the SkillTRAN software on which she relied for the job numbers she provided, as several district courts in this circuit have observed.[9] It was sufficient for the VE to explain that she relied upon SkillTRAN, that it uses "various national occupational employment statistic sources" and "various government resources," and "all their information is publicly available." (R. 90). *See also Lesner v. Colvin*, No. 12 C 7201, 2015 WL 5081267, at *8 (N.D. Ill. Aug. 24, 2015) (upholding ALJ's decision where "the VE did provide the source of her numbers, namely SkillTRAN, publicly available labor market software").

---

[9]     *See*, *e.g.*, *Luna v. Berryhill*, No. 1:17cv354, 2018 WL 2316182, at *4 (N.D. Ind. May 21, 2018) ("The VE explained in his testimony at the hearing that, although he did not have SkillTRAN's methodology memorized, the methodology was available online. As there is no legal requirement that the ALJ or VE explain the methodology used by the SkillTRAN software, the court will not remand on this point."); *Wilhelm v. Berryhill*, No. 1:17cv22, 2017 WL 5248285, at *7 (N.D. Ind. Nov. 13, 2017) (VE properly explained that he reached his job numbers by relying on SkillTRAN, and ALJ properly accepted that methodology: "there is no legal requirement that the ALJ, or the vocational expert, explain the methodology used by Skilltran").

The same is true of Plaintiff's criticism that the VE was also unaware that SkillTRAN now utilizes a database known as O*NET (Occupational Information Network) that is more current than the "obsolete" DOT. (Doc. 15, at 11-12). Since the VE was not obligated to explain SkillTRAN's methodology (*see supra* note 9), she was not obligated to explain its use of O*NET. Nor does SkillTRAN's use of O*NET foreclose the VE's use of the DOT for other job information. "While O*NET may be a better source of job data than the DOT, it is hard to see why reliance on the DOT could be considered error in light of the SSA regulations," which expressly allow reliance on the DOT. *Slone*, 2018 WL 5729591, at *6 (quoting *Boeck v. Berryhill*, No. 16-C-1003, 2017 WL 4357444, at *20 (E.D. Wis. Sept. 30, 2017)).

Finally, citing *Russell v. Berryhill*, No. 16-cv-1251, 2017 WL 3704354 (S.D. Ill. August 28, 2017), Plaintiff argues that SkillTRAN itself is not "reliable" (despite its use of the more current O*NET), and the VE's reliance upon it therefore renders her testimony unreliable as well. (Doc. 26, at 5). But *Russell* did not hold or suggest that SkillTRAN is unreliable. *See* 2017 WL 3704354, at *5 (SkillTRAN's "methodology may no longer be 'new' or 'disruptive.' Today, it may very well be widely accepted by experts in the field. That is not an issue for this Court to decide here."). Rather, *Russell* addressed an ALJ's failure to resolve an *objection* to a vocational expert's jobs numbers on the ground that "the DOT numbers do not match." *Id.* at *3. Here, by contrast, the Commissioner correctly notes that Plaintiff raised no such objection during the hearing. (Doc. 25, at 10; *see also* R. 89-94). Plaintiff does not dispute this, but argues that he nevertheless "brought out" during the hearing and in a post-hearing brief "obvious conflicts that should have alerted the ALJ that this testimony was not reliable." (Doc. 26, at 6; Doc. 15, at 12-13;

R. 338-40).  Plaintiff fails to identify these "obvious conflicts" or their impact on the ALJ's determination, but alludes to the skill and/or exertional levels of the jobs discussed by the VE, which Plaintiff claims vary as between the DOT (cited by the VE) and O*Net (used by the SkillTRAN database also cited by the VE).  (Doc. 15, at 11-13; Doc. 26, 5-6).

The Court is mindful that an ALJ has a duty "to ask a vocational expert about any possible conflicts between the vocational expert's testimony and information in the DOT." *Everhart v. Berryhill*, No. 17-cv-76, 2018 WL 446323, at *2 (S.D. Ind. Jan. 17, 2018) (citing SSR 00-4p, 2000 WL 1898704 (Dec. 4, 2000)).  And an ALJ must also obtain "a reasonable explanation for the apparent conflict" where one is identified.  *Brown v. Colvin*, 845 F.3d 247, 254-55 (7th Cir. 2016) (quoting SSR 00-4p).  But as the Commissioner argues (Doc. 25, at 15), the ALJ satisfied these obligations here.  He asked the VE if her testimony regarding available jobs was consistent with the DOT, and she answered that it was, with the exception of certain limitations (regarding absenteeism, the ambulatory device, and the sit/stand option) for which she relied on her personal experience to supplement the DOT descriptions.  (R. 89).  This response was proper.[10] The ALJ then resolved Plaintiff's post-hearing objection in his decision, concluding that the VE's testimony was based on the DOT "as well as her education and experience in the field" and was "consistent with the information contained in the [DOT]."  (R. 55). That conclusion was also legally correct.  *See supra* note 10.

Plaintiff's additional criticism that the VE's testimony nevertheless conflicted with O*NET (through her reliance upon SkillTRAN) has no bearing on whether the VE's

---

[10]    *See Brown*, 845 F.3d a 255 ("An ALJ can accept conflicting testimony if the vocational expert's 'experience and knowledge in a given situation exceeds that of the DOT's'" (quoting SSR 00-4p)); *Frank W. v. Berryhill*, No. 17 CV 9091, 2019 WL 2255771, at *8 (N.D. Ill. May 24, 2019) (same, quoting *Brown*).

testimony conflicted with the DOT. *See Everhart*, 2018 WL 446323, at *2 ("the applicable regulation and ruling require that the expert's testimony be consistent with the *DOT*, not with any other source such as the O*NET") (citing SSR 00-4p). And in any event, any challenge to the VE's testimony other than one asserting a conflict with the DOT required objection during the hearing. *Brown*, 845 F.3d at 254 (failure to object during hearing waived issues other than conflict with DOT). Plaintiff attempts to construct such an unwaivable challenge by suggesting (without citation to the record) that the VE's description of the "addresser" position that she concluded Plaintiff could perform conflicted with the DOT. (Doc. 15, at 12-13; Doc. 26, at 6). But a fair reading of the VE's testimony concerning this position indicates no such conflict. (R. 92).

Accordingly, Plaintiff's arguments in this Court that the VE failed to substantiate the jobs numbers she provided, and that the ALJ in turn erred in relying upon the VE's testimony, do not warrant remand. As the case is being remanded on other grounds, however, the Court has already directed the ALJ to advise any vocational expert relied upon of any additional limitations in Plaintiff's RFC that are determined on remand and seek any vocational expert testimony necessary to determine the impact of any such limitations on the occupational base for such a person. *See supra* at 15 and n.6. In the event such expert testimony is solicited, Plaintiff will have another opportunity to probe the reliability of the job numbers provided and lodge any proper objections at that time. *See Brown*, 845 F.3d at 254 and n.1 (although claimant "forfeited her argument regarding the vocational expert's testimony about the number of positions for each of the six jobs by failing to object during the hearing . . . if another administrative hearing occurs, Brown may be able to test the vocational expert's reliance on her sources at that time").

## **CONCLUSION**

For the foregoing reasons, Plaintiff David E's request for remand (Doc. 15) is granted as outlined above, and the Commissioner's motion for summary judgment (Doc. 24) is denied.  Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and this case is remanded to the Social Security Administration for further proceedings consistent with this Order.

ENTER:

Dated:  August 27, 2019

SHEILA FINNEGAN
United States Magistrate Judge